IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
December 6, 2004 Session

## FRENCH R. BOLEN v. SIGNAGE SOLUTIONS, LLC, ET AL.

Appeal from the Chancery Court for Knox County
No. 156697-3     Sharon Bell, Chancellor

No. E2004-01183-COA-R3-CV - FILED JANUARY 26, 2005

The issues presented in this appeal are: whether the trial court properly ruled that the employer had good cause to terminate the employee; whether the trial court properly ruled that the employer was not bound by a written employment agreement with the employee through the year 2003; and whether the trial court properly ruled that the employee was not entitled to a bonus for the year 2002. We hold that the trial court's rulings were proper and so affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Cause Remanded**

SHARON G. LEE, J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR. and D. MICHAEL SWINEY, JJ., joined.

Edward L. Summers, Knoxville, Tennessee, for the Appellant, French R. Bolen

Patty K. Wheeler and Judith A. Deprisco, Knoxville, Tennessee, for the Appellees, Signage Solutions, LLC; Trisect Engineering & Consulting Corp., and E & S Management, Inc.

**OPINION**

This appeal arises from a cause of action for breach of employment contract filed by the Appellant, French R. Bolen, against the Appellees, Signage Solutions, LLC; E & S Management, Inc., and Trisect Engineering & Consulting Corporation.

The Appellee, Signage Solutions, LLC, (hereinafter "Signage")was founded in April of 1995 by Ed Britton and Sam Krakoviak to provide project management services for the sale and installation of corporate signs. Mr. Britton and Mr. Krakoviak, the owners of Signage, had worked with Mr. Bolen at another company and were acquainted with him. In August of 1996, Mr. Bolen accepted an offer of employment with Signage as its sales and marketing manager.

At the time he was hired, the only written agreement commemorating Mr. Bolen's employment with Signage consisted of an outline as to what his bonus would be. However, in 2000, the company introduced a more formal contract entitled "Signage Solutions Employment Agreement." This contract entered into by Mr. Bolen and Signage on December 3, 2001, provided that in 2001 Mr. Bolen would be compensated at an annual salary of $71,428.57, and receive a 401K contribution. The contract provided that in 2002 Mr. Bolen would be entitled to an annual salary of $90,000.00, a 401K contribution, annual bonuses with a description of the prerequisites for payment of same, and various insurance coverages. With respect to term of employment, the contract states as follows:

> **Original Term**: The original term of this Agreement is for the period beginning December 03, 2001 and ending December 31, 2002. This Agreement shall automatically renew for successive one (1) year periods upon the same terms and conditions unless either party gives written notice to the other of their intention not to renew the Agreement. Said written notice shall be required to be given to the other party and received by them no later than December 1 of the then current term.

In October of 2002, Signage introduced changes to the above described contract by a document entitled "FIRST AMENDMENT TO EMPLOYMENT AGREEMENT." This amendment, which was signed by the parties on October 16, 2002, set forth Mr. Bolen's base salary for 2003 at $7,500.00 per month, a 401K contribution, and a description of new conditions for receiving bonuses.

In May and November of each year, Mr. Britton and Mr. Krakoviak engaged in an evaluation of each of Signage's employees. These performance reviews utilized a written form which set forth thirteen categories in which the employee was graded on a numerical scale of one to ten and rated as either "below expectations," "meets expectations," or "exceeds expectations." The employee's overall performance was also rated as either "below expectations," "meets expectations" or "exceeds expectations." The performance review of Mr. Bolen which was conducted in November of 2002 resulted in an overall rating of "below expectations."

On November 19, 2002, Mr. Bolen met with Mr. Britton and Mr. Krakoviak to discuss his "below expectations" rating. Mr. Bolen refused to sign the evaluation form, expressed his disagreement with the rating he received, and presented a sales chart to support his argument that he deserved a higher rating. The parties also discussed the fact that sales for 2002 in the amount of $15.7 million had been short of the company's projected goal of $17 million. At this meeting Mr. Bolen also criticized Mr. Britton's management style as "overbearing" and stated that company meetings regularly held on Monday mornings "had turned into Monday morning beatings." Mr. Bolen complained that certain management reports he was required to compile demanded information in too much detail. In his brief filed with this court, Mr. Bolen, indicated that these reports demanded that he "provide detailed documentation of every [sales] prospecting phone call that he had made, put it into categories, then compare that against the number of prospective calls

which had been set forth in the sales plan." Mr. Bolen stated that he advised Mr. Britton and Mr. Krakoviak "that it was very time consuming to put all of this together, type it up, and provide it to the secretary of the management meetings."

Mr. Britton testifies at trial that Mr. Bolen made comments at the November 19 meeting which caused Mr. Britton and Mr. Krakoviak "concern as to what direction [Mr. Bolen] was moving":

> Q. Tell me what those comments were.
>
> A. [By Mr. Britton] He made - - in reference to management or micro-management as you have said, French said he would not supply management reports. I said so, French, you're telling me that I should go back to the management team and I should say to them, don't worry, trust French, he's not going to supply us reports anymore because he doesn't want to do them. And he said, yes, that's what I'm asking you to do. I told him, I said, French, I can't do that. I can't sit in front of that management team and tell them that you are different than anybody else and that you don't have to supply the documentation of how you are performing and how its going to affect the rest of the company. That was the first remark, and what I repeated back to French.
>
> The second remark that French made was he said I don't know that you have the right horse for this job anymore. The third remark that he made was .... maybe you should hire some other fucking superman and I will just be the sales manager from here on out.

At the follow up meeting on November 20, in addition to the matter of Mr. Bolen's "below expectations" rating, Mr. Britton testifies that their discussion was directed toward the three remarks described above which Mr. Bolen is alleged to have made. In this regard, Mr. Britton testified as follows:

> We want to talk about ... the statements that you made, and they were repeated back to French. And then we got down to the conversation where we said, French, do you understand what you're saying to us. Do you understand the ramifications of what you're saying to us. Do you understand how its going to affect your family by telling us you cannot do your job. That's when French stated I'm a smart man. I have been thinking about this for some time.

Mr. Britton further testifies that at the conclusion of this conversation he advised Mr. Bolen that Mr. Bolen "had left him with no choice." Mr. Britton then went to his office where he composed the following letter terminating Mr. Bolen's employment with Signage:

Dear French:

It is with much regret that we find it necessary to terminate your employment with Signage Solutions effective today.

As you are aware, you, Sam and I have met on two occasions over the past two days to discuss your performance review. You strongly disagreed with the "below expectations"rating that both Sam and I feel was appropriate for your performance. In addition you stated that you did not feel confident that you could perform the required tasks and responsibilities nor be held accountable to the Management Team of this company for periodic updates and progress. It is for these reasons that you left us no choice but to terminate your employment.

Your final paycheck was given to you in this meeting. This represents any and all funds owed to you per our policies and agreements.

\*   \*   \*

Respectfully,

Ed Britton

Mr. Krakoviak testifies that, after he presented Mr. Bolen with the letter of termination, he asked Mr. Bolen to step into his office and offered to reconcile:

I said, French, you know, we've been friends a long time. I said, It does not have to end like this. I said, I think we can reconcile and French's basic comment back to me, It's gone too far and, boy, am I relieved, or, I am relieved.

But there was no reconciliation, only a lawsuit. On December 10, 2002, Mr. Bolen filed a complaint in the Chancery Court for Knox County against Signage Solutions, LLC; E & S Management, Inc.; and Trisect Engineering and Consulting Corp.[1] Among other things, the complaint states that it is untrue that Mr. Bolen "allegedly did not feel confident that he could perform the required tasks and responsibilities, and that he allegedly stated that he could not be held accountable for periodic updates and progress reports." The complaint further asserts that Mr. Bolen's termination was in breach of his employment contract and that he is "entitled to the balance of his 2002 salary of $7,500, plus his full bonus to be calculated at four percent (4%) of Defendant's net sales for the year 2002, which Plaintiff avers, based upon performance to-date will be $40,000.00." The complaint also asserts that the October 16, 2002, the amendment to the

---

[1]Testimony was presented that Trisect is a sister company of Signage and Mr. Bolen claims he is owed a bonus from Trisect. Mr. Krakoviak and Mr. Britton are each one third owners of Trisect. Testimony was presented that E & S Management is a payroll company for management of Signage and is owned by Mr. Krakoviak and Mr. Britton.

employment contract entitled Mr. Bolen to employment through calendar year 2003, including twelve months salary at $7,500.00 per month, plus 410(K) contributions and a bonus. Based upon these and other assertions, the complaint requests total damages in an amount not exceeding $150,000.00.

Following the trial of this case in December of 2003, the trial court on May 5, 2004, entered its final judgment dismissing Mr. Bolen's complaint. The trial court found that the letter terminating Mr. Bolen's employment constituted sufficient notice that Signage was "non-renewing" the 2002 employment contract. The trial court also found that the amendment to the employment contract did not go into effect until 2003 and did not prevent the non-renewal of the contract in November of 2002. With respect to the question of whether Signage had good cause to terminate Mr. Bolen's employment, the trial court stated as follows:

> The plaintiff has said he did not want to be micro-managed; that he had lost confidence that he could perform the task and be held accountable to the management team. The plaintiff said that maybe he wasn't the right horse for the job and the plaintiff suggested perhaps the defendants could find another superman.
>
> A letter was sent citing the plaintiff's position. There was no denial letter. Shortly after the "blow-up" the defendants attempted a try-it reconciliation and it was rebuffed.
>
> From all of those things I think there was good cause and I do not believe it can be said that it is more likely than not that it was anything other than a business decision.

The trial court also ruled that Mr. Bolen was not entitled to a bonus for 2002. Thereafter, Mr. Bolen filed this appeal.

The issues presented for our review are restated as follows:

1. Whether the trial court erred in finding that Signage had good cause to terminate Mr. Bolen's employment.

2. Whether the trial court erred in finding that Signage was not bound through calendar year 2003 by written employment contract with Mr. Bolen.

3. Whether the trial court erred in finding that Mr. Bolen was not entitled to a contractual bonus from Signage for calendar year 2002.

In a non-jury case such as this one we review the record *de novo* with a presumption of correctness as to the trial court's determination of facts and we must honor those findings unless there is evidence which preponderates to the contrary. Tenn. R. App. P. 13(d); *Union Carbide v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). When a trial court has seen and heard witnesses,

especially where issues of credibility and weight of oral testimony are involved, considerable deference must be accorded to the trial court's factual findings. *Seals v. England/Corsair Upholstery Mfg. Co., Inc.,* 984 S.W.2d 912, 915 (Tenn. 1999). The trial court's conclusions of law are accorded no presumption of correctness. *Campbell v. Florida Steel Corp.,* 919 S.W.2d 26, 35 (Tenn. 1996); *Presley v. Bennett*, 860 S.W.2d 857, 859 (Tenn. 1993).

### *GOOD CAUSE TERMINATION*

The first issue we address is whether Signage had good cause to terminate Mr. Bolen's employment.

As noted by our Supreme Court in *Nelson Trabue, Inc. v. Professional Management - Automotive, Inc.,* 589 S.W.2d 661, 663 (Tenn. 1979), "[a]n employer has the right to discharge an employee at any time for just cause"(quoting *Little v. Federal Container Corp.,* 452 S.W.2d 875, 877-878 (1969)). In the recent case of *Biggs v. Reinsman Equestrian Products, Inc.*, C/A No.E2004-00172-COA-R3-CV, 2002 WL 2964693 (Tenn. Ct. App. E.S., filed December 22, 2004) at *2 we restated the law applicable to termination of a contract of employment for cause as follows:

> "Whether good cause exists to terminate an employment contract is a determination made on a case-by-case basis, and exists where the discharge is 'objectively reasonable.'" *Video Catalog Channel, Inc., v. Blackwelder*, 1997 WL 581120 (Tenn. Ct. App.). When cause is required for discharging an employee, the employer has the burden of proving the existence of good cause. *Phillips v. Morrill Electric, Inc.*, 1999 WL 771511 (Tenn. Ct. App.).
>
> The failure to faithfully perform express or implied duties gives the employer the right to terminate the employment contract for cause, prior to the expiration of its terms without incurring liability. *Jackson v. The Texas Company*, 10 Tenn. App. 235 (Tenn. Ct. App. 1929).
>
> Inattention to duty is sufficient cause for discharge, since it is incumbent upon the employee to reasonably perform to advance and develop the employer's business. *Wyatt v. Brown*, 42 S.W. 478, 481 (Tenn. Chancellor. App. 1897). In general, any act which tends to injure the employer's business, interests, or reputation will justify termination of an employment agreement, and actual loss need not be proven. *Curtis v. Reeves*, 736 S.W.2d 108, 112 (Tenn. Ct. App. 1987).

In his brief, Mr. Bolen states that his employment was terminated by Ed Britton "in a fit of anger" because Mr. Bolen had "the audacity to disagree with the bottom line of his performance review." In this regard, Mr. Bolen asserts that one of the two reasons for termination of his employment set forth by Signage in the previously cited letter of November 20, 2002, was that he "strongly disagreed with the 'below expectations' rating that both Sam and I feel was appropriate for your performance." Mr. Bolen argues that he had valid reasons to disagree with the evaluation of his performance and that "acts in defense of contractual rights do not provide grounds for termination for good cause."

-6-

We find that Mr. Bolen's employment was not terminated because he disagreed with his performance evaluation. The paragraph of the November 20, 2002, letter which sets forth the reasons for the termination of Mr. Bolen's employment states:

> As you are aware, you, Sam and I have met on two occasions over the past two days to discuss your performance review. You strongly disagreed with the "below expectations"rating that both Sam and I feel was appropriate for your performance. In addition you stated that you did not feel confident that you could perform the required tasks and responsibilities nor be held accountable to the Management Team of this company for periodic updates and progress reports. It is for these reasons that you left us no choice but to terminate your employment.

We construe the phrase "these reasons" as referring to the declarations of the immediately preceding sentence - that Mr. Bolen "did not feel confident that [he] could perform required tasks and responsibilities nor be held accountable ... for periodic update and progress reports." We do not agree that it was intended that the observation "you strongly disagreed with the 'below expectations' rating that both Sam and I feel was appropriate for your performance" be included in the reasons for the termination of Mr. Bolen's employment. This construction of the letter is consistent with the testimony of both Mr. Britton and Mr. Krakoviak which indicates that the sole reasons for the termination of Mr. Bolen's employment were that he did not feel confident that he could do his job and that he was unwilling to continue generating required management reports.

Testimony in this case indicates that three remarks made by Mr. Bolen account for the termination of his job - the remark that he would not supply requested management reports, the remark that he didn't know if Signage had "the right horse for this job anymore" and the remark that "maybe you should hire some other fucking superman and I will just be sales manager from here on out."

With respect to the first of these alleged remarks, Mr. Bolen asserts that "pleas" he made that he be relieved of detailed reporting requirements were erroneously interpreted as a refusal to be managed. In support of this assertion, Mr. Bolen argues that, while Mr. Britton and Mr. Krakoviak initially testified that Mr. Bolen had stated that he would not be managed and that he would not supply the required management reports, upon cross examination both Mr. Britton and Mr. Krakoviak conceded that Mr. Bolen "was instead pleading with them not to make him provide the additional reports that he contended was taking up too much of his time." In support of this argument, Mr. Bolen cites the following testimony of Mr. Britton:

> Q. You had said that Mr. Bolen told you and Ed Krakoviak that I will not be managed, correct?
>
> A. That is correct.
>
> Q. Isn't it more accurate to say that he was pleading with you and Mr. Krakoviak not to make him provide these additional reports that he says was taking up too much of his time?

A.  He was pleading not to provide reports to you us in the management team.

Q.  Okay.  As a matter of fact in your pretrial discovery deposition at page 68, line 14, you said: "French's comments would indicate his reluctance to be managed."  Those were your words that you selected; is that correct?

A.  That would be summarizing what I heard him say.

Q.  On page 71, line 19, you said: "The third comment was about his reluctance to allow the members of the management team to manage his responsibilities."

A.  That would be summarizing it.

Q.  Those were your words.

A.  Yes, sir, that would be summarizing it.

Q.  Would you not agree that there's a difference in the word reluctance than I am refusing to do this?

A.  There is a difference, yes.

Mr. Bolen also observes that, in discovery Mr. Krakoviak attested that Mr. Bolen "made it clear that he did not want to be managed" and that Mr. Krakoviak agreed that "there was a big difference between saying 'I don't want to be' and 'I'm not going to be'."

We do not find that any of the referenced testimony of Mr. Britton and Mr. Krakoviak constitutes a concession that Mr. Bolen did not refuse to provide the requested management reports. It does not follow from Mr. Britton's apparent recognition of a difference between the word "reluctance" and the word "refusal" that he was conceding that Mr. Bolen had not refused to provide the requested reports. "Reluctance" is defined as "a feeling of not wanting to do or agree to something; being reluctant; unwillingness." WEBSTER'S NEW WORLD DICTIONARY 1229 (College Edition1966). "Refuse" is defined as "to decline to do something." *Id*, at 1223. The words "refusal" and "reluctance" are not mutually exclusive.  One may or may not refuse to perform an act which one is reluctant to perform. We construe Mr. Britton's testimony to mean that Mr. Bolen was reluctant to provide the reports *and* refused to do so. Likewise, we do not find that Mr. Krakoviak's admission that there is a difference between "I don't want to be" and "I'm not going to be" amounts to a concession that Mr. Bolen did not refuse to supply the reports.  Mr. Bolen admits that he did not want to provide the reports in the detail requested and testimony by both Mr. Britton and Mr. Krakoviak indicates that he refused to do so.  Mr. Bolen did not want to provide the reports as requested *and* refused to do so. We find no basis for Mr. Bolen's contention that upon cross examination Mr. Britton and Mr. Krakoviak "admitted that [Mr. Bolen] was merely asking them to relax the reporting requirements."

Mr. Bolen additionally argues that "only the most egregious conduct" can justify termination for violation of an implied condition of employment. We disagree. As we noted in *Biggs* at *3, in *Lawrence v. Rawlings,* C/A No. M1997-00223-COA-CV, 2001 WL 76266 (Tenn. Ct. App. M.S., filed January 30, 2001) at *5, we rejected the argument that the scope of a "for cause" termination of employment should be limited to "acts of serious misconduct, intentional wrongdoing, and other intolerable behaviors":

> We have concluded that an employee has been terminated for cause if the employee's termination stems from a job-related ground. A job-related ground includes *any act that is inconsistent with the continued existence of the employer-employee relationship*. Thus, an employee has been terminated for cause if the termination stems from the employee's failure to follow a supervisor's directions, poor job performance or *failure in the exercise of assigned duties*.

(Emphasis added)

Mr. Bolen's refusal to provide the management reports as requested by Signage constituted "a failure in the exercise of assigned duties" was an "act inconsistent with the continued existence of the employer-employee relationship." It is our conclusion that the evidence does not preponderate against the trial court's finding that sufficient cause existed for the termination of that relationship. In light of this conclusion, we need not determine whether Mr. Bolen's comments to the effect that he didn't know if they had the "right horse for the job" and that maybe they should get another "Superman" provided additional just cause for termination of his employment. But clearly these remarks did not enhance or further the continued existence of the employee-employer relationship.

### RENEWAL OF CONTRACT

The next issue presented for our review is whether the trial court erred in finding that Signage was not bound through calendar year 2003 by a written employment contract with Mr. Bolen. The trial court found that Signage did not lose its right not to renew the employment contract with Mr. Bolen when it signed the contractual amendment on October 16, 2002. Mr. Bolen argues that this amendment "was an affirmative extension of the contract through 2003, which created vested rights in the Plaintiff, which estopped or foreclosed Defendant's right to 'non-renew' the contract." While we do not agree that the evidence preponderates against the trial court's ruling with respect to this issue, it is our conclusion that this issue is otherwise resolved by our determination that Mr. Bolen's employment was terminated with just cause. As we noted in *Biggs,* "the failure to perform express or implied duties gives the employer the right to terminate the employment contract for cause, prior to the expiration of its terms without incurring liability."

### ANNUAL BONUS

The final issue we address is whether the trial court erred in ruling that Mr. Bolen's employment contract with Signage does not entitle him to a bonus for calendar year 2002.

Mr. Bolen's employment contract provides as follows with respect to his entitlement to a bonus:

**Bonus**: In addition to Employee's base salary, Employee may be entitled to additional compensation of 6 percent of Employer net sales for the year 2001 and 4 percent of Employer net sales of the year 2002 and thereafter. Net sales are defined as gross receipts for the employment period, less all expenses and costs, including all wages and salaries of all employees and owners. Net sales figures are calculated prior to taxes. Applicable withholding taxes and 401K contributions will be deducted from bonus compensation prior to distribution. *In order for Employee to be eligible for any compensation other than base salary under this section, Employee must remain employed with Employer through the end of the Original Term, or if this Agreement is extended, through the end of the extended period to which the Bonus applies.* Bonus pay out will be on an annual basis. Any Bonus contemplated by this Agreement will be payable no later than forty-five (45) days after the period for which the Bonus compensation is applicable.

(Emphasis added)

The contract specifically provides that "Employee must remain employed with Employer through the end of the Original Term, or if this Agreement is extended, through the end of the extended period to which the Bonus applies." The contract further states that "[t]he original term of this Agreement is for the period beginning December 03, 2001 and ending December 31, 2002." Mr. Bolen's employment with Signage was terminated prior to the end of the original term of the contract.

Because Mr. Bolen failed to remain employed by Signage through the end of the original term of the contract, which is a pre-condition to bonus entitlement under the contract, we find that the trial court correctly ruled that Mr. Bolen was not entitled to a bonus for 2002.

For the foregoing reasons, we affirm the judgment of the trial court and remand for further action consistent with this opinion and for collection of costs. Costs of appeal are adjudged against French R. Bolen and his surety.

_____
SHARON G. LEE,  JUDGE